**Electronically Filed
Supreme Court
SCAP-22-0000429
31-OCT-2023
08:57 AM
Dkt. 74 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

---

CITY AND COUNTY OF HONOLULU and HONOLULU BOARD OF WATER SUPPLY,
Plaintiffs-Appellees,

vs.

SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC;
EXXON MOBIL CORPORATION; EXXONMOBIL OIL CORPORATION;
ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL PRODUCTS
COMPANY LLC; CHEVRON CORPORATION; CHEVRON U.S.A. INC.;
BHP HAWAII INC.; BP PLC; BP AMERICA INC.; MARATHON PETROLEUM
CORPORATION; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY;
PHILLIPS 66; and PHILLIPS 66 COMPANY,
Defendants-Appellants,

and

BHP GROUP LIMITED and BHP GROUP PLC,
Defendants-Appellees.

---

SCAP-22-0000429

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-22-0000429; CASE NO. 1CCV-20-0000380)

October 31, 2023

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ.,
CIRCUIT JUDGE JOHNSON AND CIRCUIT JUDGE TONAKI,
ASSIGNED BY REASON OF VACANCIES,
AND EDDINS, J., CONCURRING

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

The City and County of Honolulu and the Honolulu Board of Water Supply (collectively, Plaintiffs) brought suit against a number of oil and gas producers[1] (collectively, Defendants) alleging five counts: public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass. Defendants appeal the circuit court's denial of their motions to dismiss for both lack of jurisdiction and failure to state a claim. We conclude that the circuit court properly denied both motions, and accordingly, this lawsuit can proceed.

Plaintiffs argue this is a traditional tort case alleging that Defendants engaged in a deceptive promotion campaign and misled the public about the dangers of using their oil and gas products. Plaintiffs claim their theory of liability is simple: Defendants knew of the dangers of using their fossil fuel products, "knowingly concealed and misrepresented the climate impacts of their fossil fuel products," and engaged in "sophisticated disinformation campaigns to cast doubt on the science, causes, and effects of

---

[1] Defendants are: Sunoco LP, Aloha Petroleum, Ltd., Aloha Petroleum LLC, Exxon Mobil Corporation, ExxonMobil Oil Corporation, Shell plc (f/k/a Royal Dutch Shell plc), Shell U.S.A. Inc. (f/k/a Shell Oil Company), Shell Oil Products Company LLC, Chevron Corporation, Chevron U.S.A. Inc., Woodside Energy Hawaii Inc. (f/k/a BHP Hawaii Inc.), BP plc, BP America Inc., Marathon Petroleum Corporation, ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company. The circuit court dismissed BHP Group Limited and BHP Group plc – that dismissal was not appealed and is not before this court.

global warming," causing increased fossil fuel consumption and greenhouse gas emissions, which then caused property and infrastructure damage in Honolulu. Simply put, Plaintiffs say the issue is whether Defendants misled the public about fossil fuels' dangers and environmental impact.

Defendants disagree. They say this is another in a long line of lawsuits seeking to regulate interstate and international greenhouse gas emissions, all of which have been rejected. Greenhouse gas emissions and global warming are caused by "billions of daily choices, over more than a century, by governments, companies, and individuals," and Plaintiffs "seek to recover from a handful of Defendants for the cumulative effect of worldwide emissions leading to global climate change and Plaintiffs' alleged injuries." They argue: (1) the circuit court lacked specific jurisdiction over the Defendants; (2) Plaintiffs' claims are preempted by federal common law, which in turn, was displaced by the Clean Air Act (CAA); and (3) alternatively, Plaintiffs' claims are preempted by the CAA.

We agree with Plaintiffs. This suit does not seek to regulate emissions and does not seek damages for interstate emissions. Rather, Plaintiffs' complaint "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign." Mayor & City Council of Baltimore v. BP P.L.C., 31 F.4th 178,

233 (4th Cir. 2022), cert. denied, 143 S. Ct. 1795 (2023) (characterizing a complaint brought against many of the same Defendants in this case alleging broadly the same counts, theory of liability, and injuries). This case concerns torts committed in Hawaiʻi that caused alleged injuries in Hawaiʻi.

Thus, Defendants' arguments on appeal fail. First, Defendants are subject to specific jurisdiction in Hawaiʻi because: (1) Plaintiffs' allegations that Defendants misled consumers about fossil fuels products' dangers "arise out of" and "relate to" Defendants' contacts with Hawaiʻi, i.e., Defendants' sale and marketing of those fossil fuel products in Hawaiʻi, Ford Motor Co. v. Montana Eighth Judicial District Court, 141 S. Ct. 1017, 1025 (2021); (2) it is reasonable for Hawaiʻi courts to exercise specific jurisdiction over Defendants, and doing so does not conflict with interstate federalism principles because Hawaiʻi has a "significant interest[] . . . [in] 'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,'" see id. at 1030 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985)); and (3) the Supreme Court has never imposed a "clear notice" requirement, see id. at 1025.

Second, the CAA displaced federal common law governing interstate pollution damages suits; after displacement, federal common law does not preempt state law. See Am. Elec. Power Co.

4

v. Connecticut, 564 U.S. 410, 423-24 (2011) ("AEP"); Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc., 25 F.4th 1238, 1260 (10th Cir. 2022), cert. denied, 143 S. Ct. 1795 (2023) ("[T]he federal common law of nuisance that formerly governed transboundary pollution suits no longer exists due to Congress's displacement of that law through the CAA."). We must only consider whether the CAA preempts state law. AEP, 564 U.S. at 429 ("[T]he availability vel non of a state lawsuit depends inter alia on the preemptive effect of the [CAA].").

Third, the CAA does not preempt Plaintiffs' claims. The CAA does not occupy the entire field of emissions regulation. See Merrick v. Diageo Ams. Supply, Inc., 805 F.3d 685, 695 (6th Cir. 2015) (determining that there is "no evidence that Congress intended that all emissions regulation occur through the [CAA's] framework"). There is no "actual conflict" between Plaintiffs' state tort law claims and the CAA's overriding federal purpose or objective. See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig. (MTBE), 725 F.3d 65, 101 (2d Cir. 2013) (concluding that CAA did not preempt state tort law claims relating to a gasoline additive where it was possible to comply with both state and federal law).

Therefore, we affirm the circuit court's orders denying Defendants' motion to dismiss for lack of jurisdiction and motion to dismiss for failure to state a claim.

## II.  BACKGROUND

### A.  Circuit Court Proceedings

#### 1.  Original complaint, removal, and remand

In March 2020, Plaintiffs filed their original complaint in the Circuit Court for the First Circuit alleging that for decades, Defendants knew their fossil fuel products caused greenhouse gas emissions and global warming, but they failed to warn consumers of the threat, and actively worked to discredit scientific evidence that supported the existence of global warming.  In April 2020, Defendants removed the case to federal court.  Defendants argued that removal jurisdiction was appropriate because federal common law governed, and the CAA and other federal statutes preempted Plaintiffs' claims.[2]

On Plaintiffs' motion, the federal district court remanded the case to state circuit court.  The federal court explained that the Ninth Circuit, in City of Oakland v. BP PLC, 969 F.3d 895, 906-08 (9th Cir. 2020), recently rejected

---

[2]  Defendants asserted eight grounds for federal jurisdiction: (1) the Outer Continental Shelf Lands Act (OCSLA) because "[a] significant portion of oil and gas exploration and production" occurs on the shelf; (2) the federal officer removal statute, see 28 U.S.C. § 1442(a)(1), because oil and gas production "took place under the direction of a federal officer to support critical national security, military, and other core federal government operations;" (3) federal enclave jurisdiction because some oil production occurred on federal enclaves like the Outer Continental Shelf; (4) federal common law, which defendants argue governs Plaintiffs' claims; (5) federal question jurisdiction because Plaintiffs' claims "necessarily raise[] federal questions under the [CAA], EPA and other federal regulations and international treaties on climate change to which the United States is a party;" (6) federal preemption by the CAA and other related statutes; (7) bankruptcy jurisdiction; and (8) admiralty jurisdiction.

Defendants' federal-common-law, federal-preemption, and federal-question-jurisdiction arguments. City & Cnty. of Honolulu v. Sunoco LP, No. 20-CV-00163-DKW-RT, 2021 WL 531237, at *2 n.8 (D. Haw. Feb. 12, 2021). The court explained that the "principal problem with Defendants' arguments is that they misconstrue Plaintiffs' claims." Id. at *1. "More specifically, contrary to Defendants' contentions, Plaintiffs have chosen to pursue claims that target Defendants' alleged concealment of the dangers of fossil fuels, rather than the acts of extracting, processing, and delivering those fuels." Id. Further, Plaintiffs' nuisance claims arise "not through [Defendants'] 'fossil fuel production activities,' . . . but through their alleged failure to warn about the hazards of using their fossil fuel products and disseminating misleading information about the same." Id. at *3.

On appeal, the Ninth Circuit affirmed the district court's order remanding the case to state circuit court. City & Cnty. of Honolulu v. Sunoco LP, 39 F.4th 1101, 1113 (9th Cir. 2022). Defendants filed an application for writ of certiorari to the U.S. Supreme Court, which was denied. Sunoco LP v. City & Cnty. of Honolulu, 143 S. Ct. 1795 (2023) (denying application for certiorari).

**2.    First Amended Complaint**

In its First Amended Complaint (Complaint), Plaintiffs added the Board of Water Supply (BWS) as a plaintiff and amended certain allegations to incorporate damages specific to BWS. Plaintiffs also added an allegation that the wrongful conduct giving rise to the second cause of action (private nuisance) was committed with actual malice, permitting punitive damages.

First, Plaintiffs allege that human activity is causing the atmosphere and oceans to warm, sea levels to rise, snow cover to diminish, oceans to acidify, and hydrologic systems to change. Greenhouse gas emissions, which are largely a byproduct of combustion of fossil fuels, are the chief cause of this warming. The accumulation of greenhouse gases in the atmosphere has adverse impacts on the earth, including: warming of the average surface temperature, resulting in increasingly frequent heatwaves; sea level rise; flooding of land and infrastructure; changes to the global climate, including longer periods of drought; ocean acidification; increased frequency of extreme weather; changes to ecosystems; and impacts on human health associated with extreme weather, decreased air quality, and vector-borne illnesses.

Next, Plaintiffs allege that Defendants knew about the dangers associated with their products because they, or their predecessors in interest, were members of the American Petroleum

8

Institute (API).  Beginning in the 1950s, scientists warned the API that fossil fuels were causing atmospheric carbon dioxide levels to increase.  In 1965, President Lyndon B. Johnson's Scientific Advisory Committee warned of global warming and the catastrophic impacts that could result.  The API President related these findings to industry leaders at the association's annual meeting that year.  Plaintiffs allege that by 1965, industry leaders were aware of the global warming phenomenon caused by their products.  Defendants continued to gather information on the climate change impacts of their products throughout the 1960s, 1970s, and 1980s.

During the 1980s, many of the defendants in the present case formed their own research units focused on climate modeling.  API provided a forum where Defendants shared research efforts and corroborated each other's findings.  Plaintiffs allege that by 1988, Defendants "had amassed a compelling body of knowledge about the role of anthropogenic greenhouse gases, and specifically those emitted from the normal use of Defendants' fossil fuel products, in causing global warming and its cascading impacts[.]"

Plaintiffs allege that around 1990, public discussion shifted from gathering information on climate change to international efforts to curb emissions.  At this point, Defendants – rather than collaborating with the international

community to help curb emissions – "embarked on a decades-long campaign designed to maximize continued dependence on their products and undermine national and international efforts to rein in greenhouse gas emissions." Defendants began a public relations campaign to cast doubt on the science connecting global climate change to their products. Defendants promoted their products through misleading advertisements and funding "climate change denialist organizations."

According to Plaintiffs, Defendants' efforts to cast doubt on climate science continued throughout the 1990s and 2000s. Defendants "bankroll[ed]" scientists with "fringe opinions" in order to create a false sense of disagreement in the scientific community. Defendants' own scientists, experts, and managers had previously acknowledged climate change's effects. At the same time, Defendants worked to change public opinion over climate change's existence and avoid regulation. Defendants funded dozens of think tanks, front groups, and dark money foundations pushing climate change denial, with ExxonMobil alone spending almost $31 million.

Plaintiffs allege that, while Defendants publicly cast doubt on climate change, they simultaneously invested in operational changes to prepare for its adverse consequences. For example, Defendants allegedly raised offshore oil platforms to protect against rising sea levels, reinforced them against

storms, and developed new technologies for extracting oil in places previously blocked by polar sea ice.

Defendants now claim they are investing in renewable energy, but Plaintiffs claim these statements are a pretense. Defendants' advertisements and promotional materials do not disclose the risks of their products, and they continue to ramp up fossil fuel production, including new fossil fuel development.

Plaintiffs allege that they have sustained damages caused by Defendants' failure to warn and deceptive promotion of dangerous products. Defendants' conduct "is a substantial factor in causing global warming," which has had adverse effects on Plaintiffs. These effects include sea level rise (causing flooding, erosion, and beach loss); more extreme weather events; ocean warming (causing destruction of coral reefs); loss of endemic species; and diminished availability of fresh water. Because of Defendants' conduct, Plaintiffs suffered damage to their facilities and property, incurred increased planning and preparation costs to adapt communities to global warming's effects, collected less tax revenue due to impacts on tourism, and suffered the cost of public health impacts such as an increase in heat-related illnesses. Plaintiffs have already suffered damage to beach parks, roads, and drain way infrastructure from flooding and sea level rise.

Plaintiffs bring five counts under state law: public nuisance, private nuisance, strict-liability failure to warn, negligent failure to warn, and trespass. All counts rely on the same theory of liability: Defendants knew about the dangers of using their fossil fuel products, failed to warn consumers about those known dangers, and engaged in a sophisticated disinformation campaign to increase fossil fuel consumption, all of which exacerbated the impacts of climate change in Honolulu.

**3.    Defendants' joint motions to dismiss**

Defendants filed two motions to dismiss, the first for lack of jurisdiction and the second for failure to state a claim. In their first motion to dismiss, Defendants argued the circuit court did not have specific jurisdiction because

> "(1) the Complaint avers, as it must, that Plaintiffs' alleged injuries arise out of and relate to worldwide conduct by countless actors, not Defendants' alleged contacts with Hawai'i; (2) Defendants did not have 'clear notice' that as a result of their activities in Hawai'i they could be sued here for activity occurring around the world; and (3) exercising jurisdiction would be constitutionally unreasonable."

In their second motion to dismiss, Defendants argued: (1) Plaintiffs' claims are interstate pollution claims, which must be brought under federal common law, not state common law, and that the CAA preempts interstate pollution federal common law claims; or alternatively, (2) Plaintiffs' state common law claims are preempted by the CAA. Plaintiffs opposed.

12

At the motion hearing, Plaintiffs summarized their theory of liability, which is central to the jurisdictional and preemption issues on appeal. Plaintiffs explained that defendants "concealed and misrepresented the climate impacts of their products, using sophisticated disinformation campaigns to discredit the science of global warming." Defendants also allegedly misled "consumers and the rest of the world about the dangers of using their products as intended in a profligate manner." Thus, "these deceptive commercial activities . . . inflated the overall consumption of fossil fuels, which increased greenhouse gas emissions, which exacerbated climate change, which created the hazardous environmental conditions" that have allegedly injured Plaintiffs.

### 4. The circuit denied Defendants' motions to dismiss

The circuit court subsequently denied both motions.[3]

The circuit court denied Defendants' motion to dismiss for lack of jurisdiction, concluding that it had specific jurisdiction because Plaintiffs' claims arose out of and related to Defendants' sales and marketing contacts in Hawai'i. See, e.g., Ford Motor, 141 S. Ct. at 1025. The circuit court also determined it would be reasonable to exercise specific

---

[3] The Honorable Jeffrey P. Crabtree presided.

13

jurisdiction over Defendants.  See Hawaii Forest & Trial Ltd. v. Davey, 556 F. Supp. 2d 1162, 1168-72 (D. Haw. 2008).

The circuit court also denied Defendants' joint motion to dismiss for failure to state a claim.  The court explained that the standard for the review of a motion to dismiss "is generally limited to the allegations in the complaint, which must be deemed true for purposes of the motion," Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawaiʻi 251, 266, 151 P.3d 732, 747 (2007), but courts are "not required to accept conclusory allegations," Civ. Beat L. Ctr. for the Pub. Int., Inc. v. City & Cnty. of Honolulu, 144 Hawaiʻi 466, 474, 445 P.3d 47, 55 (2019).  And "the issue is not solely whether the allegations as currently pled are adequate."  Rather, "[a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief under any set of facts or any alternative theory."  (Citations omitted).

The circuit court first concluded that City of New York v. Chevron Corp., 993 F.3d 81 (2d Cir. 2021), cited by Defendants, "has limited application to this case, because the claims in the instant case are both different from and were not squarely addressed in [that] opinion."  The circuit court then determined that federal common law did not govern Plaintiffs'

14

state law claims.  The circuit court also determined that Plaintiffs' claims were not preempted by the CAA.

The circuit court also rejected Defendants' argument that a large damages award in this case could act as a de facto emissions regulation because an unfavorable judgment would "not prevent Defendants from producing and selling as much fossil fuels as they are able, as long as Defendants make the disclosures allegedly required, and do not engage in misinformation."  The circuit court concluded:

> A broad doctrine that damages awards in tort cases impermissibly regulate conduct and are thereby preempted would intrude on the historic powers of state courts.  Such a broad "damages = regulation = preemption" doctrine could preempt many cases common in state court, including much class action litigation, products liability litigation, claims against pharmaceutical companies, and consumer protection litigation.

Last, the circuit court concluded that it was appropriate for state common law to govern Plaintiffs' claims:

> Defendants argue (and the City of New York opinion expresses) that climate change cases are based on "artful pleading."  Respectfully, we often see "artful pleading" in the trial courts, where new conduct and new harms often arise:
>
>> The argument that recognizing the tort will result in a vast amount of litigation has accompanied virtually every innovation in the law.  Assuming that it is true, that fact is unpersuasive unless the litigation largely will be spurious and harassing.  Undoubtedly, when a court recognizes a new cause of action, there will be many cases based on it.  Many will be soundly based and the plaintiffs in those cases will have their rights vindicated.  In other cases, plaintiffs will abuse the law for some unworthy end, but the possibility of abuse cannot obscure the need to provide an appropriate remedy.
>
> Fergerstrom v. Hawaiian Ocean View Estates, 50 Haw. 374, 377 (1968) (opinion by Levinson, J.)[.]  Here, the causes

15

of action may seem new, but in fact are common. They just seem new due to the unprecedented allegations involving causes and effects of fossil fuels and climate change. Common law historically tries to adapt to such new circumstances.

The circuit court then granted Defendants leave to file an interlocutory appeal.

B.   **Appellate Proceedings**

Defendants timely filed their joint notice of interlocutory appeal from the circuit court's Order Denying Defendants' Joint Motion to Dismiss for Failure to State a Claim and its Order Denying Defendants' Joint Motion to Dismiss for Lack of Personal Jurisdiction. This court subsequently granted Plaintiffs' application for transfer from the Intermediate Court of Appeals.

On appeal, Defendants frame this case as one where Plaintiffs "seek[] to hold Defendants liable under Hawai'i tort law for harms allegedly attributable to global climate change." This case should be dismissed because "these emissions flow from billions of daily choices, over more than a century, by governments, companies, and individuals about what types of fuels to use, and how to use them." Plaintiffs "seek to recover from a handful of Defendants for the cumulative effect of worldwide emissions leading to global climate change and Plaintiffs' alleged injuries."

Plaintiffs dispute Defendants' characterization of the Complaint. Plaintiffs argue that the Complaint does "not ask for damages for all effects of climate change; rather, [it] seek[s] damages only for the effects of climate change allegedly caused by Defendants' breach of Hawai'i law regarding failure to disclose, failures to warn, and deceptive promotion." Plaintiffs contend their Complaint is "straightforward": "Defendants knowingly concealed and misrepresented the climate impacts of their fossil fuel products" and that "deception inflated global consumption of fossil fuels, which increased greenhouse gas emissions, exacerbated climate change, and created hazardous conditions in Hawai'i." Despite Defendants' contention that this suit seeks to regulate fossil fuel production, "so long as Defendants start warning of their products' climate impacts and stop spreading climate disinformation, they can sell as much fossil fuel as they wish without fear of incurring further liability."

Defendants raise three points of error: (1) the circuit court lacked specific jurisdiction over the Defendants; (2) Plaintiffs' claims are preempted by federal common law, which in turn, was displaced by the CAA; and (3) alternatively, Plaintiffs' claims are preempted by the CAA.

First, Defendants argue that specific jurisdiction does not attach because: (1) Plaintiffs cannot show that their

17

claims "arise out of or relate to," Ford Motor, 141 S. Ct. at 1025, Defendants' contacts with Hawai'i because Plaintiffs' alleged injuries did not "occur in-state as a result of the use of the product in-state;" (2) Defendants' in-state conduct "did not reasonably place them on clear notice" they would be subject to specific jurisdiction in Hawai'i as required by the federal Due Process Clause; and (3) the exercise of "personal jurisdiction here would conflict with federalism principles" limiting state jurisdiction in areas of national interest.

Plaintiffs dispute Defendants' arguments, contending: (1) the U.S. Supreme Court explained in Ford Motor that it had "never framed the specific jurisdiction inquiry as always requiring proof of causation — i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct," id. at 1026; (2) Defendants had fair warning they could be haled into Hawai'i courts, and Ford Motor did not create a "clear notice" requirement, id. at 1027; and (3) Plaintiffs' suit does not interfere with national energy policy because Defendants can continue to produce as much oil as they want as long as they stop their tortious marketing conduct.

Second, Defendants argue that Plaintiffs' state law claims are governed by federal common law "because they seek redress for harms allegedly caused by interstate and international emissions." Relying on City of New York,

Defendants say that federal common law preempts Plaintiffs' state common law tort claims, and in turn, the CAA preempts the federal common law. See City of New York, 993 F.3d at 93-96. Defendants contend that "[o]nce this court correctly concludes that Plaintiffs' claims are necessarily governed by federal law, it follows that Plaintiffs also have no remedy under federal law."

Plaintiffs counter that the CAA displaced federal common law governing interstate pollution, and that law "no longer exists." Boulder, 25 F.4th at 1260; see also AEP, 564 U.S. at 423. Plaintiffs claim that "once federal common law disappears, the question of state law preemption is answered solely by reference to federal statutes, not the ghost of some judge-made federal law." See AEP, 564 U.S. at 429 ("[T]he availability . . . of a state lawsuit depends . . . on the preemptive effect of the [CAA]."). According to Plaintiffs, the proper preemption analysis requires examining only whether the CAA preempts their state law claims. The court need not consider first whether displaced federal common law preempts Plaintiffs' state claims, and second whether displaced federal common law is preempted by the CAA.

Third and finally, Defendants alternatively argue that the CAA preempts Plaintiffs' claims. Defendants say Plaintiffs seek damages for injuries allegedly caused by out-of-state

19

sources' emissions.  Relying on N. Carolina ex rel. Cooper v. Tenn. Valley Auth., 615 F.3d 291, 303, 306 (4th Cir. 2010), Defendants contend that the "CAA preempts state-law claims concerning out-of-state emissions."  Plaintiffs counter that the "CAA does not concern itself in any way with the acts that trigger liability under [its] Complaint, namely: the use of deception to promote the consumption of fossil fuel products." They say the CAA regulates "pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft," Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 308 (2014), not the traditional state tort claims for failure to warn and deceptive promotion.

### III. STANDARD OF REVIEW

**A.   Motion to Dismiss**

> A trial court's ruling on a motion to dismiss is reviewed de novo.  The court must accept plaintiff's allegations as true and view them in the light most favorable to the plaintiff; dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief.

Delapinia v. Nationstar Mortg. LLC, 150 Hawai'i 91, 97–98, 497 P.3d 106, 112–13 (2021) (quoting Goran Pleho, LLC v. Lacy, 144 Hawai'i 224, 236, 439 P.3d 176, 188 (2019)).

B.    Jurisdiction

"A trial court's determination to exercise personal jurisdiction is a question of law reviewable de novo when the underlying facts are undisputed."  Shaw v. N. Am. Title Co., 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994) (citing Bourassa v. Desrochers, 938 F.2d 1056, 1057 (9th Cir. 1991)).  Plaintiffs "need make only a prima facie showing that: (1) [defendant's] activities in Hawai'i fall into a category specified by Hawai'i's long-arm statute, [Hawai'i Revised Statutes (HRS)] § 634-35; and (2) the application of HRS § 634-35 comports with due process."  Id. at 327, 876 P.3d at 1295 (citing Cowan v. First Ins. Co. of Hawai'i, 61 Haw. 644, 649, 608 P.2d 394, 399 (1980)).  When the circuit court relies on pleadings and affidavits, without conducting an "'full-blown evidentiary hearing,'" the plaintiff's "'allegations are presumed true and all factual disputes are decided in [plaintiff's] favor.'"  Id. (citations omitted).

C.    Preemption

Questions of federal preemption "are questions of law reviewable de novo under the right/wrong standard."  Rodrigues v. United Pub. Workers, AFSCME Loc. 646, AFL-CIO, 135 Hawai'i 316, 320, 349 P.3d 1171, 1175 (2015).

## IV.  DISCUSSION

We affirm the circuit court's orders denying Defendant's motions to dismiss.  Similar to Baltimore, Plaintiffs' Complaint "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign."  31 F.4th at 233. While Plaintiffs' Complaint does reference global emissions repeatedly, "these references only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution." Id.  Plaintiffs do "not merely allege that Defendants contributed to climate change and its attendant harms by producing and selling fossil-fuel products; it is the concealment and misrepresentation of the products' known dangers - and the simultaneous promotion of their unrestrained use - that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change."  Id. at 233-34.

As the circuit court explained:

> The court recognizes that nuisance, trespass, and failure to warn vary somewhat in terms of their specific elements.  All of these claims, however, share the same basic structure of requiring that a defendant engage in tortious conduct that causes injury to a plaintiff. Moreover, as the court understands it, Plaintiffs are relying on the same basic theory of liability to prove each of their claims, namely: that Defendants' failures to disclose and deceptive promotion increased fossil fuel consumption, which – in turn – exacerbated the local impacts of climate change in Hawaiʻi.

Because this is a traditional tort case alleging Defendants misled consumers and should have warned them about the dangers of using their products, Defendants' arguments fail. Defendants' contacts with Hawai'i (selling oil and gas here) arise from and relate to Plaintiffs' claims (deceptive promotion and failure to warn about the dangers of using the oil and gas sold here). Defendants are alleged to have engaged in tortious acts in Hawai'i and have extensive contacts in Hawai'i, and it is therefore reasonable for Defendants to be haled into court here. Further, neither displaced federal common law nor the CAA preempts Plaintiffs' state-law tort claims.

A. **Defendants Are Subject to Specific Jurisdiction in Hawai'i**

Specific jurisdiction attaches where (1) Defendants' activity falls under the State's long-arm statute, and (2) the exercise of jurisdiction comports with due process. See Shaw, 76 Hawai'i at 327, 876 P.2d at 1295. As we recently explained, "the two-step inquiry may in fact be redundant" because Hawai'i's long-arm statute "was adopted to expand the jurisdiction of the State's courts to the extent permitted by the due process clause of the Fourteenth Amendment." Yamashita v. LG Chem, Ltd., 152 Hawai'i 19, 21-22, 518 P.3d 1169, 1171-72 (2022), opinion after certified question answered, 62 F.4th 496 (9th Cir. 2023) (quoting Cowan, 61 Haw. at 649, 608 P.2d at 399). But while "this collapsed inquiry yields the same practical result as the

23

two-step test" and is "not improper," "there is value in remembering that personal jurisdiction rests on both negative federal limits and positive state assertions of jurisdiction." Id. at 22, 518 P.3d at 1172.  Accordingly, we engage in the two-step test outlined in Yamashita.

First, Defendants' activity in Hawai'i falls under the long-arm statute.  Plaintiffs' Complaint alleges that Defendants conducted fossil fuel business in Hawai'i, committed torts in Hawai'i, and caused injury in Hawai'i.  See HRS § 634-35(a)(1)-(2)(2016)[4] (persons subject to Hawai'i's personal jurisdiction when transact business or commit tort within state).  Further, Defendants did not dispute below and do not dispute on appeal that their in-state activity falls under the long-arm statute.

Second, exercising specific jurisdiction over Defendants comports with due process.  Specific jurisdiction

---

[4]     HRS § 634-35, Hawai'i's long-arm statute, provides:

**Acts submitting to jurisdiction.**  (a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, the person's personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of the acts:
     (1) The transaction of any business within this State;
     (2) The commission of a tortious act within this State;
     (3) The ownership, use, or possession of any real estate situated in this State;
     (4) Contracting to insure any person, property, or risk located within this State at the time of contracting.

comports with due process where: (1) defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws"; (2) plaintiffs' claim "arises out of or relates to the defendant[s'] forum-related activities"; and (3) exercising specific jurisdiction "comport[s] with fair play and substantial justice, i.e. it must be reasonable." Int. of Doe, 83 Hawai'i 367, 374, 926 P.2d 1290, 1297 (1996). This three-part test is "commonly referred to as the minimum contacts test." Greys Ave. Partners, LLC v. Theyers, 431 F. Supp. 3d 1121, 1128 (D. Haw. 2020). "The minimum contacts test 'ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts[.]'" Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp., 905 F.3d 597, 603 (9th Cir. 2018) (quoting Burger King, 471 U.S. at 475).

Defendants do not contest the first prong of the minimum contacts test - that they "purposefully avail[ed]" themselves of the forum. See id. Therefore, at issue is whether Plaintiffs' claims "arise out of or relate to" Defendants' Hawai'i contacts and whether the exercise of specific jurisdiction is reasonable. Ford Motor, 141 S. Ct. at 1025. Defendants further argue that, under Ford Motor, they did not have "clear notice" they could be subject to specific

25

jurisdiction in Hawai'i.  Id. at 1030 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

As set forth below, Defendants are subject to specific jurisdiction in Hawai'i because: (1) Plaintiffs' allegations that Defendants misled consumers about the dangers of using their products "arise out of" and "relate to" Defendants' contacts with Hawai'i, here Defendants' sale and promotion of oil and gas in Hawai'i, id. at 1025 (quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 137 S. Ct. 1773, 1786 (2017)); (2) it is reasonable for Hawai'i courts to exercise specific jurisdiction over Defendants and doing so does not conflict with interstate federalism principles because Hawai'i has a "significant interest[] [in] 'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors,'" see id. at 1030 (quoting Burger King, 471 U.S. at 473); and (3) the U.S. Supreme Court has never imposed a "clear notice" requirement, despite having the opportunity to do so, see id. at 1025.

Courts typically analyze jurisdictional contacts on a claim-by-claim basis.  See, e.g., Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 274-75 (5th Cir. 2006).  But courts "need not assess contacts on a claim-by-claim basis if all claims arise from the same forum contacts."  See, e.g., Moncrief Oil Int'l Inc. v. OAO Gazprom, 414 S.W.3d 142, 150-51

26

(Tex. 2013).  Plaintiffs bring five claims: public nuisance, private nuisance, strict liability failure to warn, negligent failure to warn, and trespass.  Plaintiffs' claims all arise from the same alleged forum contacts for all Defendants – here, Defendants' products were transported, traded, distributed, promoted, marketed, refined, manufactured, sold, and/or consumed in Hawai'i.  Plaintiffs' claims also all arise from the same alleged acts – here, Defendants' deceptive promotion of and failure to warn about the dangers of using oil and gas.  Accordingly, we examine all claims against all Defendants together.  See id.

1.    Plaintiffs' claims "arise out of or relate to" Defendants' in-state conduct

Quoting Ford Motor, Defendants argue that when personal jurisdiction is based on "'advertising, selling, and servicing,'" the alleged injuries must be "caused by the use and malfunction of the defendant's products within the forum State" for specific jurisdiction to attach.  141 S. Ct. at 1022.  In short, Defendants say "the injury must occur in-state as a result of the use of the product in-state" for specific jurisdiction to attach.  In this case, Defendants contend that Hawai'i is a small state, with only 0.02% of the world's population, that accounts for only 0.06% of the world's carbon dioxide emissions per year.  Quoting Native Vill. of Kivalina v.

27

ExxonMobil Corp., Defendants argue that "'the undifferentiated nature of greenhouse gas emissions from all global sources and their world-wide accumulation over long periods of time' mean that 'there is no realistic possibility of tracing any particular alleged effect of global warming to any particular emissions by any specific person, entity, [or] group at any particular point in time.'"[5]  663 F. Supp. 2d 863, 876 (N.D. Cal. 2009) ("Kivalina I"), aff'd, 696 F.3d 849 (9th Cir. 2012). Given the "undifferentiated nature of greenhouse gas emissions," Defendants argue the circuit court erred in asserting specific jurisdiction.

---

[5]     In Kivalina I, the Village of Kivalina brought a federal common law nuisance claim for damages against 24 oil, energy, and utility companies. 663 F. Supp. 2d at 868.  Defendants' Kivalina I quotations are taken from the court's Article III standing analysis, not from an analysis of whether the court had specific jurisdiction under the minimum contacts test.  See id. at 881.  The court concluded that because Kivalina sought damages for greenhouse gas emissions, which come from "global sources and their worldwide accumulation", the "multitude of alternative culprits" meant Kivalina could not establish its injury was fairly traceable to Defendants.  Id. at 880-81 (quotation marks omitted).  Accordingly, the court dismissed the case for lack of standing.  Id. at 882.  Kivalina I involved different claims than those before us in this case, and was disposed of on standing, not minimum contacts grounds – it is inapposite with respect to Defendants' jurisdictional arguments.  See id. at 868, 882.

But Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849 (9th Cir. 2012) ("Kivalina II") is relevant to Defendants' federal common law arguments.  There, the Ninth Circuit affirmed the trial court's dismissal for lack of jurisdiction in Kivalina I, but not because Kivalina lacked standing. Id. at 856-58.  Instead, the Ninth Circuit determined that "AEP extinguished Kivalina's federal common law public nuisance damage action, along with the federal common law public nuisance abatement actions."  696 F.3d at 858. Accordingly, Kivalina could not bring its federal common law nuisance claim, and dismissal was proper.  Id.

We agree with Plaintiffs that "Defendants' arguments for reversal flow[] from a single, fatally flawed premise: they say, in various formulations, that they can only be subject to personal jurisdiction if the climate change injuries Plaintiffs allege were caused by Defendants' fossil fuels being burned in Hawai'i."[6]  Indeed, the U.S. Supreme Court rejected an argument similar to Defendants' causation argument in Ford Motor, holding that the "causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities."  141 S. Ct. at 1026.

In Ford Motor, the U.S. Supreme Court consolidated two cases with the same underlying facts: in both, there was a car accident in the forum state involving an allegedly malfunctioning Ford vehicle designed, manufactured, and sold outside of the forum state.  Id. at 1023.  Ford moved to dismiss both cases, arguing that "the state court . . . had jurisdiction only if the company's conduct in the State had given rise to the plaintiff's claims."  Id.  Ford argued that a "causal link" was required: it was only subject to specific jurisdiction in the forum state "if the company had designed, manufactured, or –

---

[6] Defendants' causation arguments are better saved for the merits stage of this litigation where Plaintiffs must prove causation with respect to all of its tort claims.  Of course, we express no opinion as to the validity of those arguments.

most likely – sold in the State the particular vehicle involved in the accident."  Id.

The Supreme Court held that for specific jurisdiction to attach, a defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'"  Id. at 1024 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'"  Id. at 1025 (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)).  The contacts "must show that the defendant deliberately 'reached out beyond' its home — by, for example, 'exploi[ting] a market' in the forum State or entering a contractual relationship centered there."  Id. (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)).

Accordingly, for specific jurisdiction to attach, a plaintiff's claims "'must arise out of or relate to defendant's contacts' with the forum."  Id. (quoting Bristol-Myers, 137 S. Ct. at 1786).  "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing."  Id. at 1026.  Ford Motor thus requires only "a 'connection' between a plaintiff's suit and a defendant's activities" for specific jurisdiction to attach.  Id. at 1026 (quoting Bristol-Myers, 137 S. Ct. at 1776).  "Or put just a bit

differently, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." Id. at 1025 (quoting Bristol-Myers, 137 S. Ct. at 1779) (quotation marks omitted).

Similar to Defendants' arguments here, the Ford Motor defendants contended that the link between their forum contacts and plaintiffs' claims "must be causal in nature: Jurisdiction attaches 'only if the defendant's forum conduct gave rise to the plaintiff's claims.'" Id. at 1026. But the Supreme Court made clear that it has "never framed the specific jurisdiction inquiry as always requiring proof of causation — i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct." Id.

The Court relied on World-Wide Volkswagen, 444 U.S. at 295, which "held that an Oklahoma court could not assert jurisdiction over a New York car dealer just because a car it sold later caught fire in Oklahoma." Ford Motor, 141 S. Ct. at 1027. The World-Wide Volkswagen court "contrasted the dealer's position to that of two other defendants — Audi, the car's manufacturer, and Volkswagen, the car's nationwide importer (neither of which contested jurisdiction)." Id. "[I]f Audi and Volkswagen's business deliberately extended into Oklahoma (among other States), then Oklahoma's courts could hold the companies

31

accountable for a car's catching fire there — even though the vehicle had been designed and made overseas and sold in New York."  Id.  And while "technically 'dicta,'" the Audi/Volkswagen scenario from World-Wide Volkswagen has become the "paradigm case of specific jurisdiction" and has been "reaffirmed" in other cases.  Id. at 1027-28.  This paradigm case appeared again in Daimler, where the court again "did not limit jurisdiction to where the car was designed, manufactured, or first sold."  Id. at 1028.

Turning back to the facts in Ford Motor, the Court explained that "[b]y every means imaginable - among them, billboards, TV and radio spots, print ads, and direct mail - Ford urges [people in the forum states] to buy its vehicles." Id.  Ford dealers regularly maintained and repaired Ford cars, and Ford distributed replacement parts throughout both states. Id.  Ford "systematically served a market in [the forum states] for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States."  Id.  Accordingly, "there is a strong 'relationship among the defendant, the forum, and the litigation' – the 'essential foundation' of specific jurisdiction."  Id.  (quoting Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).

The same is true here.  Defendants do not contest that they purposefully availed themselves of the rights and

privileges of conducting extensive business in Hawai'i. Indeed, the Complaint alleges that each Defendant conducted substantial business in Hawai'i. Each defendant is alleged to have transported, traded, distributed, promoted, marketed, refined, manufactured, sold, and/or consumed oil and gas in Hawai'i. Plaintiffs also allege that Defendants failed to warn consumers in Hawai'i about the dangers of using the oil and gas Defendants sold in the state and that Defendants engaged in a deceptive marketing campaign to conceal, deny, and discredit efforts to make those dangers known to the public. Plaintiffs further allege that Defendants' tortious failure to warn and deceptive promotion caused extensive injuries in Hawai'i, including:

> injury or destruction of City - or [Honolulu Board of Water Supply] - owned or operated facilities and property deemed critical for operations, utility services, and risk management, as well as other assets that are essential to community health, safety, and well-being; increased planning and preparation costs for community adaptation and resiliency to global warming's effects; decreased tax revenue due to impacts on the local tourism - and ocean-based economy; increased costs associated with public health impacts; and others.

Just as in Ford Motor, "there is a strong 'relationship among the defendant, the forum, and the litigation' – the 'essential foundation' of specific jurisdiction." See id. (quoting Helicopteros, 466 U.S. at 414). Defendants sold and marketed oil and gas in Hawai'i, availed themselves of Hawai'i markets and laws, and the at-issue litigation alleges tortious acts and damages in Hawai'i that

33

"arise out of" or "relate to" Defendants Hawai'i contacts, i.e., oil and gas business conducted in the state. See id. at 1026. Indeed, the connection between Defendants, Hawai'i, and this litigation is more closely intertwined than that of Ford Motor. See id. at 1028. Unlike in Ford Motor, here, the alleged injury-causing products (oil and gas) were marketed and sold in the forum state. See id. Therefore, Defendants are subject to specific jurisdiction because there is a clear and unambiguous "affiliation between the forum and the underlying controversy." See id. (quoting Bristol-Myers, 137 S. Ct. at 1779) (quotation marks omitted).

Defendants rely on Martins v. Bridgestone Am. Tire Ops., LLC, 266 A.3d 753, 759, 761 (R.I. 2022). Martins is inapposite. In Martins, a Rhode Island resident drove a truck from Massachusetts to Connecticut, and struck a tree in Connecticut when an allegedly defective tire made in and installed in Tennessee failed. Id. at 756. The Rhode Island resident was severely injured and was taken to and later died in Rhode Island. Id. The only connection between Rhode Island (the forum state) and the litigation was that the decedent was a Rhode Island resident who passed away in Rhode Island. Id. at 761. The Rhode Island Supreme Court did not endorse the causation test put forth by Defendants here – the court instead

determined that the plaintiffs' claims did not arise out of or relate to the tire companies' Rhode Island contacts.  Id.

The Supreme Court has "endorse[d] an 'effects' test of jurisdiction in situations involving tortious acts."  Shaw, 76 Hawai'i at 330, 876 P.2d at 1298 (quoting Calder v. Jones, 465 U.S. 783, 789 (1984)).  "Under this theory, asserting jurisdiction against nonresident defendants who commit torts directed at a forum state with the intention of causing in-state 'effects' satisfies due process."  Id.  The effects test inquiry "focuses on conduct that takes place outside the forum state and that has effects inside the forum state."  Freestream Aircraft, 905 F.3d at 604.  Generally, "[t]he commission of an intentional tort in a state is a purposeful act that will satisfy the first two requirements [of the minimum contacts test]."  Id. at 603 (quoting Paccar Int'l, Inc. v. Com. Bank of Kuwait, S.A.K., 757 F.2d 1058, 1064 (9th Cir. 1985)).  Therefore, where a nonresident defendant is alleged to have committed a tort directed at the forum state, the effects test is an alternate due process theory capable of establishing that: (1) the defendant purposefully availed themselves of the forum; and (2) the plaintiff's claim arises out of or relates to the defendant's forum contacts.  Id. at 1062.

Plaintiffs argues that "the effects test . . . is satisfied here" because "the Complaint alleges that the targets

of Defendants' deceptive marketing and failure to warn included audiences and consumers in Hawai'i, and those misrepresentations and omissions, directed at least in part to Hawai'i, contributed to Plaintiff's injuries." Defendants counter that Plaintiffs failed to identify in their Complaint "a single deceptive message that Defendants allegedly made in or directed at Hawai'i," which "defeats personal jurisdiction under the effects test."

The circuit court did not engage in an "effects" test analysis, and the parties' briefs almost exclusively address the traditional "minimum contacts" test. Because Defendants are subject to specific jurisdiction under the minimum contacts test, see infra Section IV(A)(1), it is not necessary to engage in an effects test analysis as to the first two prongs of the due process inquiry. See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1357 (11th Cir. 2013) (determining that because the plaintiff had met the "purposeful availment" prong of the "minimum contacts" test, the court "need not analyze the 'effects test' here").

Relatedly, Defendants argue that, under Shaw, Plaintiffs' claims "bear at most an 'incidental' . . . relationship to Defendants' in-state activities and thus lack the requisite close connection found in Ford Motor that permitted exercise of specific jurisdiction." In Shaw, the

36

court held that for the purposes of the long-arm statute's "transacting business" subsection, see HRS § 634-35(a)(1), the alleged Hawai'i business conduct (the signing of escrow documents) was "merely incidental" to business at the crux of the case (the escrow transaction, which happened in California). Shaw, 76 Hawai'i at 328, 876 P.2d at 1296. Thus, the plaintiff failed to sufficiently allege, for the purposes of the long-arm statute, that the defendant "transact[ed] business" in Hawai'i. Id.

The Court in Shaw held that the plaintiff sufficiently alleged under another subsection of the long-arm statute that the defendant committed a "tortious act" in Hawai'i, see HRS § 634-35(a)(2), and that due process was satisfied under the "effects" test. Shaw, 76 Hawai'i at 329-330, 332, 876 P.2d at 1297-98, 1300. Notably, Shaw's "merely incidental" holding did not affect the court's due process analysis – the defendant was still subject to specific jurisdiction. See Shaw, 76 Hawai'i at 328, 876 P.2d at 1296. Here, Defendants' in-state conduct is anything but "merely incidental" to Plaintiffs' claims. See id.

2. **Exercising specific jurisdiction is reasonable and does not "conflict with federalism principles"**

The exercise of specific jurisdiction must "comport with fair play and substantial justice, i.e. it must be reasonable." Doe, 83 Hawai'i at 374, 926 P.2d at 1297. In Doe,

this court adopted the Ninth Circuit's seven-factor test for determining whether the exercise of jurisdiction is reasonable, which is as follows:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of any conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) concerns of judicial efficiency; (6) the significance of the forum to the plaintiff's interest in relief; and (7) the existence of alternative fora.

Id. (citing Caruth v. Int'l Psychoanalytical Ass'n, 59 F.3d 126, 127 (9th Cir. 1995)).

"None of the factors is solely dispositive; all seven are weighed in the factual circumstances in which they arise." Id. (citation omitted). And, as here, "where a defendant who purposefully has directed [their] activities at forum residents seeks to defeat jurisdiction, [they] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477 (emphasis added). Therefore, "we begin with a presumption of reasonableness." Caruth, 59 F.3d at 128.

Defendants do not engage with the Doe factors, but appear to argue that factors three and four weigh against determining that the exercise of jurisdiction over Defendants is "reasonable." Doe, 83 Hawai'i at 374, 926 P.2d at 1297. Defendants say that "exercising personal jurisdiction here would be '[un]reasonable, in the context of our federal system of

government.'" Quoting Ford Motor, 141 S. Ct. at 1024)(brackets in original). According to Defendants, permitting specific jurisdiction in this context would subject companies to climate change suits in every court in the country. And if Plaintiffs' theory were adopted abroad, "American companies could be sued on climate change-related claims in courts around the world." According to Defendants, "[d]ue process does not countenance that result." We review each of the Doe factors in turn, and conclude that they weigh in favor of exercising specific jurisdiction over Defendants because doing so is "reasonable." Id. Defendants have not "present[ed] a compelling case" that the exercise of specific jurisdiction here would be unreasonable. See Burger King, 471 U.S. at 477.

The first factor examines "the extent of the defendants' purposeful interjection into the forum state's affairs." Doe, 83 Hawai'i at 374, 926 P.2d at 1297. Defendants are alleged to have engaged in repeated, purposeful business in Hawai'i. Their products were transported, traded, distributed, promoted, marketed, refined, manufactured, sold, and/or consumed in Hawai'i.

The second factor examines "the burden on the defendant of defending in the forum." Doe, 83 Hawai'i at 374, 926 P.2d at 1297. Defendants are multi-national oil and gas corporations with billions in annual revenues. The burden on

39

Defendants in defending a suit in a state where Defendants conduct extensive oil and gas business is slight.

The third factor examines "the extent of any conflict with the sovereignty of the defendants' [home] state." Id. Defendants' primary argument is that Plaintiffs' "claims [] implicate the interests of numerous other States and nations, many of which do not share the 'substantive social policies' Plaintiffs seek to advance - such as curbing energy production and the use of fossil fuels or allocating the downstream costs of consumer use to the energy companies to bear directly." But this lawsuit does not seek to regulate emissions or curb energy production – it seeks to hold Defendants accountable for allegedly (1) failing to warn about the dangers of their fossil fuel products and (2) deceptively promoting those products. Holding Defendants accountable for their Hawai'i torts implicates the sovereignty of no state other than Hawai'i. And, even if this case did involve "substantive social policies" not advanced by other states, "the 'fundamental substantive social policies' of another State may be accommodated through application of the forum's choice-of-law rules." Burger King, 471 U.S. at 477.

Relying on Bristol-Myers Squibb Co. v. Superior Ct. of Cal., 137 S. Ct. at 1780, Defendants further contend that "asserting personal jurisdiction over these out-of-state Defendants for global climate change would impermissibly

40

interfere with the power of Defendants' home States (or nations) over their own corporate citizens and could punish commercial conduct that occurred beyond the forum State's borders." However, Defendants' reliance on Bristol-Myers is misplaced.

The U.S. Supreme Court in Bristol-Myers addressed whether a claim arises out of or relates to a defendant's contacts – the second prong of the minimum contacts test.  Id. at 1781.  The Court did not hold that specific jurisdiction was lacking because doing so would be unreasonable.  See id. Instead, the Court determined that specific jurisdiction was improper because there was no "connection between the forum and the specific claims at issue."  See id.

The fourth factor examines "the forum state's interest in adjudicating the dispute."  Doe, 83 Hawaiʻi at 374, 926 P.2d at 1297.  Defendants argue that "Hawaiʻi's interests in this suit . . . are no greater than other States,'" and later state that Hawaiʻi's interest is "slight."  However, we agree with Plaintiffs that Hawaiʻi "has a strong interest in remedying local harms related to corporate misconduct."

The fifth factor examines the "concerns of judicial efficiency."  Id.  Because this factor is not relevant here, and Defendants make no arguments to the contrary, we do not address it.

The sixth factor examines "the significance of the forum to the plaintiff's interest in relief." Id. Again, Plaintiffs seeks monetary damages for injuries allegedly suffered in Hawai'i as a result of Defendants' alleged tortious conduct in Hawai'i.

The seventh factor examines the "existence of alternate fora." Id. Defendants have not shown that there is an alternate forum that is better situated than Hawai'i to decide this dispute.

In sum, the Doe factors weigh heavily in favor of determining it is reasonable to exercise specific jurisdiction over Defendants. See id. Further, given that Defendants purposefully availed themselves of Hawai'i markets, Defendants have failed to overcome the presumption that the exercise of specific jurisdiction is reasonable. See Burger King, 471 U.S. at 477, Caruth, 59 F.3d at 128.

3. **The Due Process Clause does not require that Defendants have "clear notice" they could be subject to specific jurisdiction in Hawai'i**

The exercise of specific jurisdiction is governed by the three-part minimum contacts test: jurisdiction is proper where: (1) the defendant purposefully avails itself of the forum; (2) the defendant's contacts "arise out of or relate to" the plaintiff's claim; and (3) the exercise of specific jurisdiction is reasonable. Doe, 83 Hawai'i at 374, 926 P.2d at

42

1297.  Where the minimum contacts test is met, the exercise of specific jurisdiction comports with due process.  Id.

Defendants argue that in addition to the minimum contacts test, the Fourteenth Amendment's "Due Process Clause requires a defendant's activities in the forum to place it on 'clear notice' that it is susceptible to a lawsuit in that State for the claims asserted by a plaintiff," Ford Motor, 141 S. Ct. at 1025, 1030.  (Emphasis added.)  This is wrong.  The minimum contacts test "provides defendants with 'fair warning'" or, as the Supreme Court explained, "knowledge that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign."  Id. at 1025 (emphasis added) (quoting Burger King, 471 U.S. at 472) (brackets in original).  "[F]air warning" is not an additional requirement for the exercise of specific jurisdiction.  Rather, "fair warning" is what due process "provides."  If the minimum contacts test is met, a defendant has fair warning; and if it has fair warning, then due process is satisfied.

The U.S. Supreme Court has not held that "clear notice" is a separate requirement (on top of the minimum contacts test) necessary for the exercise of specific jurisdiction.  In Ford Motor, the Court used the phrase "clear notice" three times, once in a parenthetical and twice when summarizing the holdings in World-Wide Volkswagen.  Id. at 1025,

1027, 1030.  At no point did the Court in <u>Ford Motor</u> hold that "clear notice" was required for the exercise of specific jurisdiction.  <u>Id.</u>  Rather, the Supreme Court used the phrase "clear notice" in <u>Ford Motor</u> and other cases like <u>World-Wide Volkswagen</u> to describe situations where a defendant's contacts were so pervasive that the defendant had <u>more than</u> "fair warning" they could be subject to specific jurisdiction in a forum.  <u>Id.</u> at 1025, 1030; <u>see</u> <u>also</u> <u>World-Wide Volkswagen</u>, 444 U.S. at 297.

In sum, if a defendant has purposefully availed themselves of a forum, the claim arises from or relates to those contacts with the forum, and the exercise of jurisdiction is reasonable, the defendant has "fair warning" they could be subject to specific jurisdiction in that forum.  <u>See</u> <u>id.</u> at 1025.  The minimum contacts test (and the "fair warning" it provides) allows a defendant to "'structure [its] primary conduct' to lessen or avoid exposure to a given State's courts." <u>Id.</u> (quoting <u>World-Wide Volkswagen</u>, 444 U.S. at 297 (brackets in original)).  Here, the exercise of specific jurisdiction comports with due process because: (1) Defendants purposefully availed themselves of the benefits and protections of Hawai'i laws; (2) Plaintiffs' claims "arise out of or relate to" Defendants' Hawai'i contacts; and (3) the exercise of specific

44

jurisdiction is reasonable.  Defendants had – at a minimum –
"fair warning" they could be subject to suit in Hawai'i.  See id.

B.    **Federal Common Law Does Not Preempt Plaintiffs' Claims**

Defendants next argue that "[f]ederal law exclusively
governs claims seeking relief for injuries allegedly caused by
interstate and international emissions."  They say that the
"basic scheme of the [federal] Constitution . . . demands that
federal common law," AEP, 564 U.S. at 421 (quotation marks
omitted), govern any dispute involving "air and water in their
ambient or interstate aspects," Illinois v. City of Milwaukee,
406 U.S. 91, 103 (1972) ("Milwaukee I").  Defendants' argument
ignores well-settled law that "the federal common law of
nuisance that formerly governed transboundary pollution suits no
longer exists due to Congress's displacement of that law through
the CAA."  Boulder, 25 F.4th at 1260; see also AEP, 564 U.S. at
421.

And despite its displacement, Defendants also argue
that federal common law plays a role in our preemption analysis.
They say that we should first look to whether displaced federal
common law preempts Plaintiffs' claims, and then to whether the
CAA displaced federal common law.  We disagree.  "When a federal
statute displaces federal common law, the federal common law
ceases to exist."  Baltimore, 31 F.4th at 205.  And as the
Supreme Court explained in AEP, once federal common law is

45

displaced, "the availability vel non of a state lawsuit depends inter alia on the preemptive effect of the federal Act," not displaced federal common law.  564 U.S. at 429. Accordingly, our preemption analysis requires analyzing the preemptive effect of only the CAA – and, it has none in this context.  See supra Section IV(C).

Defendants' federal common law preemption arguments also fail because Plaintiffs' claims do not seek to regulate emissions.  The federal common law cited by Defendants formerly governed transboundary pollution abatement and damages suits, not the tortious marketing and failure to warn claims brought by Plaintiffs.  We agree with the circuit court:

> Plaintiffs' framing of their claims in this case is more accurate.  The tort causes of action are well recognized. They are tethered to existing well-known elements including duty, breach of duty, causation, and limits on actual damages caused by the alleged wrongs.  As this court understands it, Plaintiffs do not ask for damages for all effects of climate change; rather, they seek damages only for the effects of climate change allegedly caused by Defendants' breach of Hawai'i law regarding failures to disclose, failures to warn, and deceptive promotion (without deciding the issue, presumably by applying Hawai'i's substantial factor test, see, e.g., Estate of Frey v. Mastroianni, 146 Hawai'i 540, 550 (2020)).  Plaintiffs do not ask this court to limit, cap, or enjoin the production and sale of fossil fuels.  Defendants' liability in this case, if any, results from alleged tortious conduct, and not from lawful conduct in producing and selling fossil fuels.

Simply put, Plaintiffs' claims do not seek to regulate emissions.  Instead, Plaintiffs' Complaint "clearly seeks to challenge the promotion and sale of fossil-fuel products without warning and abetted by a sophisticated disinformation campaign."

46

Baltimore, 31 F.4th at 233.  Plaintiffs' references to emissions in its Complaint "only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil-fuel products contribute to greenhouse gas pollution."  Id.

1.  **The federal common law governing interstate pollution abatement and damages suits was displaced by the CAA**

Because the CAA displaced federal common law, we cannot accept Defendants' argument that the federal common law governs here.  First, "AEP extinguished [] federal common law public nuisance damage action[s], along with the federal common law public nuisance abatement actions."  Native Vill. of Kivalina v. ExxonMobil Corp., 696 F.3d 849, 857 (9th Cir. 2012) ("Kivalina II").  Federal appellate courts have recently reaffirmed that the federal common law once governing interstate pollution damages and abatement suits was displaced.[7]  In Rhode Island v. Shell Oil Prod. Co., 35 F.4th 44 (1st Cir. 2022), cert. denied sub nom. Shell Oil Prod. Co. v. Rhode Island, 143 S. Ct. 1796 (2023), the First Circuit held that "[t]he Clean Water Act and the [CAA] . . . have statutorily displaced any federal common law that previously existed," and as such, the

---

[7]    These courts did so in the context of removal jurisdiction.  All held that federal common law did not govern the plaintiffs' claims, and as such, federal courts did not have jurisdiction over the at-issue state law claims.  But, regardless of context, all three cases directly addressed whether federal common law governs state common law claims based on failure to warn and deceptive promotion theories.  And all three courts determined that federal common law had been displaced.

court could not "rule that any federal common law controls Rhode Island's claims." Id. at 55 (quotation marks omitted).

In Baltimore, the Fourth Circuit held that federal common law did not control the city of "Baltimore's state-law claims because federal common law in this area cease[d] to exist due to statutory displacement, Baltimore [did] not invoke[] the federal statute displacing federal common law, and . . . the CAA does not completely preempt Baltimore's claims." 31 F.4th at 204. And in Boulder, the Tenth Circuit held that "the federal common law of nuisance that formerly governed transboundary pollution suits no longer exists due to Congress's displacement of that law through the CAA." 25 F.4th at 1260. Indeed, Defendants even concede that "[t]he Supreme Court, the Ninth Circuit, and the Second Circuit have all held that a tort-law claim for greenhouse gas emissions arising under federal common law fails as a matter of law under [Federal Rules of Civil Procedure Rule] 12(b)(6) because Congress displaced such claims when it established a comprehensive regulatory scheme for emissions via the CAA." (Emphasis added.)

Nonetheless, Defendants cite to three cases (Milwaukee I, Oakland I, and City of New York) that they argue support the proposition that federal common law governs Plaintiffs' claims. These cases have either been overturned (Milwaukee I and Oakland I) or rely on flawed reasoning (City of New York).

48

In Milwaukee I, the state of Illinois brought an original action against the state of Wisconsin in the Supreme Court for Wisconsin's "pollution . . . of Lake Michigan, a body of interstate water."[8]  Milwaukee I, 406 U.S. at 93.  Illinois alleged Wisconsin discharged "200 million gallons of raw or inadequately treated sewage and other waste materials" daily into Lake Michigan.  Id.  The Supreme Court explained that "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism, we have fashioned federal common law." Id. at 105 n.6.  The Court concluded that "[c]ertainly these same demands for applying federal law are present in the pollution of a body of water such as Lake Michigan," and that federal law governs disputes involving "air and water in their ambient or interstate aspects."  Id. at 103, 105 n.6.

Accordingly, the Court held that the "question of apportionment of interstate waters is a question of 'federal common law' upon which state statutes or decisions are not conclusive."  Id. at 105.  Notably, the Court acknowledged that the federal common law it created might one day be superseded by statute, explaining: "new federal laws and new federal

---

[8]  The Court ultimately determined that "original jurisdiction [was] not mandatory," declined to exercise original jurisdiction, and remitted the case to the "appropriate district court whose powers are adequate to resolve the issues."  Milwaukee I, 406 U.S. at 98, 108.

regulations may in time preempt the field of federal common law of nuisance." Id. at 107.

After the Court remitted Milwaukee I to the district court to determine the outcome of the case under federal common law, Congress "enacted the Federal Water Pollution Control Amendments of 1972 [(1972 FWPCA)]." City of Milwaukee v. Illinois, 451 U.S. 304, 307 (1981) ("Milwaukee II"). On appeal in Milwaukee II, the Court held that in enacting the 1972 FWPCA, which governed sewage discharges into interstate bodies of water, Congress displaced the federal common law created in Milwaukee I. The Court concluded:

> Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.
>
> [ . . . ]
>
> The establishment of such a self-consciously comprehensive program by Congress, which certainly did not exist when [Milwaukee I] was decided, strongly suggests that there is no room for courts to attempt to improve on that program with federal common law.

Milwaukee II, 451 U.S. at 317, 319.

Accordingly, the Court determined that "no federal common-law remedy was available," thus overruling Milwaukee I. Id. at 332. That holding was reaffirmed in AEP when the Supreme

50

Court determined that the federal common law claims permitted by Milwaukee I were displaced by the CAA.[9] AEP, 546 U.S. at 424.

Defendants also rely on City of Oakland v. BP PLC, 325 F. Supp. 3d 1017, 1021–22 (N.D. Cal. 2018) ("Oakland I"), vacated and remanded sub nom. City of Oakland v. BP PLC, 960 F.3d 570 (9th Cir. 2020), opinion amended and superseded on denial of reh'g, 969 F.3d 895 (9th Cir. 2020). In Oakland I, the cities of Oakland and San Francisco brought suit against five large oil and gas companies[10] in state court alleging one count of nuisance on the same theory that Plaintiffs raises

---

[9] Defendants also cite to Illinois v. City of Milwaukee, 731 F.2d 403, 411 (7th Cir. 1984) ("Milwaukee III") for the proposition that the displacement of "one form of federal law (common law) by another (federal statute) does not somehow breathe life into nonexistent state law." On remand from Milwaukee II, Illinois argued that "Illinois common law controlled this case until Milwaukee I judicially promulgated federal common law, and that since the 1972 FWPCA dissipated federal common law, Illinois law must again control." Id. at 406. The Seventh Circuit disagreed, and held that, "[g]iven the logic of Milwaukee I and Milwaukee II, we think federal law must govern in this situation except to the extent that the 1972 FWPCA (the governing federal law created by Congress) authorizes resort to state law." Id. at 411. Respectfully, the Seventh Circuit's approach in Milwaukee III ignores the presumption that state laws and claims are not preempted absent "a clear and manifest purpose of Congress" to do so. See Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.").

Not surprisingly, the Supreme Court implicitly overruled the Seventh Circuit's Milwaukee III decision in AEP when the Court held that, after federal common is displaced, "the availability vel non of a state lawsuit depends inter alia on the preemptive effect of the federal Act." 564 U.S. at 429. Thus, contrary to Milwaukee III and Defendants' argument, state law that was previously preempted by federal common law does have new life when the federal common law is displaced. See id.

[10] The five defendants in Oakland I (Chevron Corporation, Exxon Mobil Corporation, BP p.l.c., Royal Dutch Shell plc, and ConocoPhillips) are also defendants in this case.

51

here.  Id. at 1021-22.  The case was removed to federal court, and Oakland and San Francisco then amended their complaint to add a "separate claim for public nuisance under federal common law."  Id.  The district court determined that AEP and Kivalina II held that the CAA displaced federal common law claims for emissions abatement and damages.  Id. at 1024.  Accordingly, the district court dismissed Oakland and San Francisco's federal common law claim and the state law nuisance claim because "nuisance claims must stand or fall under federal common law." Id. at 1028.

On appeal, the Ninth Circuit reversed the federal district court, determining that Oakland and San Francisco only added the federal common law claim "to conform" to an earlier district court ruling.  City of Oakland v. BP PLC, 969 F.3d 895, 909 (9th Cir. 2020) ("Oakland II").  The Ninth Circuit also determined that the state law nuisance claim should not have been dismissed because "it is not clear that the claim requires an interpretation or application of federal law at all, because the Supreme Court has not yet determined [(since AEP displaced the old federal common law)] that there is a [new] federal common law of public nuisance relating to interstate pollution." Id. at 906.  Indeed, in Kivalina II, the Ninth Circuit held just that – concluding that federal common law suits (not state common law suits) "aimed at imposing liability on energy

52

producers for 'acting in concert to create, contribute to, and maintain global warming' and 'conspiring to mislead the public about the science of global warming,' [were] displaced by the [CCA]." Id. (quoting Kivalina II, 696 F.3d at 854) (emphasis added). Therefore, the trial court was incorrect when it determined that displaced federal common law required the dismissal of Oakland and San Francisco's state common law claim because it was preempted. Id. Since displaced federal common law did not provide a federal jurisdictional hook, the Ninth Circuit remanded the case to the federal district court to determine whether there was an alternate basis for federal jurisdiction with respect to only the state common law claim. Id. at 911.

Further, the Second Circuit in City of New York also held that the "[CAA] displace[d] federal common law claims concerned with domestic greenhouse gas emissions." 993 F.3d at 95. Thus, Defendants' best case – City of New York – goes against them in part by holding that the very federal common law they rely on is no longer good law. Indeed, City of New York is consistent with AEP, Rhode Island, Baltimore, Boulder, Kivalina II, and Oakland II in holding that the federal common law once governing interstate pollution suits was displaced by the CAA. Accordingly, Defendants' argument that federal common law preempts Plaintiffs' claims fails, because Defendants do not

53

point to any case recognizing a federal common law action for interstate pollution suits that has not been displaced by the CAA.

### 2. Federal common law does not retain preemptive effect after it is displaced

Defendants acknowledge that the federal common law that once governed interstate pollution damages and abatement suits was displaced by the CAA. Nonetheless, Defendants argue that despite displacement, federal common law still lives. Defendants say that federal common law still lives but only with enough power to preempt state common law claims "involving interstate air pollution." According to Defendants, federal common law is both dead and alive – it is dead in that the CAA has displaced it, but alive in that it still operates with enough force to preempt Plaintiffs' state law claims.

Under Defendants' preemption theory, this court should first look to whether the federal common law governing interstate pollution damages and abatement claims preempts Plaintiffs' state common law claims. After determining that federal common law does in fact preempt Plaintiffs' state common law claims, Defendants say this court should then look to whether the CAA displaced federal common law claims (and Defendants say it did). Indeed, were this court to adopt Defendants' two-step approach, Plaintiffs would have no viable

cause of action under state or federal law.  Federal common law would preempt state common law, and in turn, the CAA would displace federal common law.  No common law cause of action would be available.  Further, no federal statutory cause of action would be available because the CAA does not contain one available to Plaintiffs, see 42 U.S.C. § 7401 et seq., and any state statutory cause of action would be preempted by federal common law, which, in turn, would be displaced by the CAA.

We decline to follow Defendants' two-step approach because it engages in backwards reasoning.  This court would first need to determine whether the federal common law governing interstate pollution suits is still good law before determining whether it can preempt state law claims.  And, as we have explained above, the federal common law governing interstate pollution suits was displaced by the CAA and "no longer exists." Boulder, 25 F.4th at 1260; see also Milwaukee II, 451 U.S. at 314 ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears.").

Defendants' approach cannot be reconciled with AEP. In AEP, two groups of plaintiffs, including eight States, brought suit against the Tennessee Valley Authority and four private companies who were allegedly responsible for 10% of global emissions.  564 U.S. at 418.  The plaintiffs brought

55

federal common law and state law nuisance claims, and "sought injunctive relief requiring each defendant to cap its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade."  564 U.S. at 419 (quotation marks omitted).  The Supreme Court held that the CAA displaced only federal common law governing interstate emissions.  Id. at 428-29.  Having determined that federal common law was displaced, the Court concluded that "the availability vel non of a state lawsuit depends inter alia on the preemptive effect of the [CAA]."  Id. at 429.  And since the parties had not briefed whether the CAA preempted "the availability of a claim under state nuisance law," the Court left "the matter open for consideration on remand."  Id.

In AEP, with regard to the plaintiffs' state common law nuisance claims, the relevant inquiry was not: (1) whether federal common law preempted the remaining state law claims, and if so, (2) whether the CAA displaced the federal common law. Id.  Instead, AEP made clear that whether the state law nuisance claims were preempted depended only on an analysis of the CAA because "'when Congress addresses a question previously governed by a decision rested on federal common law, . . . the need for such an unusual exercise of law-making by federal courts disappears.'"  AEP, 564 U.S. at 423 (quoting Milwaukee II, 451

U.S. at 314).[11] The Supreme Court did not analyze the federal common law's preemptive effect because it was displaced by the CAA. See id. And if federal common law retained preemptive effect after displacement, the Court would have instructed the trial court on remand to examine whether displaced federal common law preempted the state law claims. See id.

Simply put, displaced federal common law plays no part in this court's preemption analysis. Once federal common law is displaced, the federal courts' task is to "interpret and apply statutory law[.]" Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO, 451 U.S. 77, 95 n.34 (1981) (emphasis added). Therefore, "[a]s instructed in AEP and supported by [Kivalina II], we look to the federal act that displaced the federal common law to determine whether the state claims are preempted." Boulder, 25 F.4th at 1261. The correct preemption analysis requires an examination only of the CAA's preemptive effect because "AEP extinguished [] federal common law public nuisance damage action[s], along with the federal common law public

---

[11] There is a "significant distinction between the statutory displacement of federal common law and the ordinary preemption of a state law." Baltimore, 31 F.4th at 205. Federal common law is disfavored because "it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest." AEP, 564 U.S. at 423-24. Thus, "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." Id. at 423. Instead, "[t]he test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." Id. at 424. When federal common law is displaced, it "no longer exists." Boulder, 25 F.4th at 1260.

nuisance abatement actions." Kivalina II, 696 F.3d at 857; see also id. at 866 (Pro, J., concurring) ("Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law.").

Defendants primarily rely on City of New York to argue that their two-step preemption analysis is the correct one. In that case, New York City filed a state-law tort suit in federal court "against five oil companies to recover damages caused by those companies' admittedly legal commercial conduct in producing and selling fossil fuels around the world." 993 F.3d at 86. At issue was whether New York City's claims were preempted by either federal common law or the CAA. Id. at 89. The Second Circuit first looked to whether federal common law governing interstate pollution damages and abatement suits preempted New York City's state law claims, holding that it did. Id. at 95 (determining that New York City's "claims must be brought under federal common law"). Next, the court examined whether the federal common law was displaced by the CAA, holding again that it was. Id. at 98 (determining that "federal common law claims concerning domestic greenhouse gas emissions are displaced by statute."). Thus, the Second Circuit held that displaced federal common law preempted New York City's state law claims. Id. at 95-98.

58

We agree with the Fourth Circuit's analysis in

Baltimore, which explained why City of New York is not

persuasive in that respect:

> [A]fter recognizing federalism and the need for a
> uniform rule of decision as federal interests, City of New
> York confusingly concludes that federal common law is "most
> needed in this area" because New York's state-law claims
> touch upon the federal government's relations with foreign
> nations. [993 F.3d] at 91–92. But it never details what
> those foreign relations are and how they conflict with New
> York's state-law claims. See id. at 92. The same is true
> when City of New York declares that state law would
> "upset[] the careful balance" between global warming's
> prevention and energy production, economic growth, foreign
> policy, and national security. Id. at 93. Besides
> referencing statutes acknowledging policy goals, the
> decision does not mention any obligatory statutes or
> regulations explaining the specifics of energy production,
> economic growth, foreign policy, or national security, and
> how New York law conflicts therewith. See id. It also
> does not detail how those statutory goals conflict with New
> York law. See id. [Critically,] City of New York
> essentially evades the careful analysis that the Supreme
> Court requires during a significant-conflict analysis.

Id. (emphasis added) (footnote omitted).

3. **Even were federal common law to control, it would not govern Plaintiffs' claims**

Even if federal common law governing interstate

pollution claims had not been displaced, Plaintiffs' claims

would not be preempted by it. The claims permitted by federal

common law in this area were brought against polluting entities

and sought to enjoin further pollution.[12]  See, e.g., Milwaukee

---

[12]  Defendants cite to no cases recognizing federal common law claims for interstate pollution damages. But this is neither here nor there. Damages claims are no longer available under federal common law. In Kivalina II, Kivalina sought "damages for harm caused by past emissions." 696 F.3d at 857. The Ninth Circuit determined that "displacement of a federal common law right of action means displacement of remedies." Id. Therefore, "AEP extinguished Kivalina's federal common law public nuisance damage action,

I, 406 U.S. at 93 (requesting court enjoin "pollution by the defendants of Lake Michigan"). Indeed, in AEP, the plaintiffs sued the Tennessee Valley Authority and other powerplant owners and sought injunctive relief to prevent future emissions. 564 U.S. at 418. As the Supreme Court explained in AEP, this "specialized federal common law" governed "suits brought by one State to abate pollution emanating from another State." Id. at 421. Thus, the source of the injury in federal common law claims is pollution traveling from one state to another. That is not what Plaintiffs allege here.

Rather, as the Ninth Circuit explained in earlier proceedings in this case, Plaintiffs "allege that oil and gas companies knew about climate change, understood the harms energy exploration and extraction inflicted on the environment, and concealed those harms from the public." Sunoco LP, 39 F.4th at 1106 (emphasis added). As Plaintiffs allege, "Defendants' liability is causally tethered to their failure to warn and deceptive promotion," and "nothing in this lawsuit incentivizes — much less compels — Defendants to curb their fossil fuel production or greenhouse gas emissions." Simply put, the source of Plaintiffs' alleged injury is Defendants' allegedly tortious

---

along with the federal common law public nuisance abatement actions." Id. We agree. Therefore, even though it appears that no court has recognized a federal common law claim for interstate pollution damages, such claims were displaced by the CAA. See id.

marketing conduct, not pollution traveling from one state to another.

Numerous courts have rejected similar attempts by oil and gas companies to reframe complaints alleging those companies knew about the dangers of their products and failed to warn the public or misled the public about those dangers.  The Ninth Circuit did so in this case.  See id. at 1113.  And in other cases alleging similar deceptive promotion and failure to warn torts, the Fourth Circuit, Tenth Circuit, and the Districts of Connecticut, Massachusetts, and Minnesota have also rejected attempts to characterize those claims as being about emissions and pollution.  See Boulder, 25 F.4th at 1264 (Boulder's claims "are premised on the Energy Companies' activities of 'knowingly producing, promoting, refining, marketing and selling a substantial amount of fossil fuels used at levels sufficient to alter the climate, and misrepresenting the dangers.'");  Baltimore, 31 F.4th at 217 ("None of Baltimore's claims concern emission standards, federal regulations about those standards, or pollution permits.  Their Complaint is about Defendants' fossil-fuel products and extravagant misinformation campaign that contributed to its injuries.");  Connecticut v. Exxon Mobil Corp., No. 3:20-CV-1555 (JCH), 2021 WL 2389739, at *13 (D. Conn. June 2, 2021) ("ExxonMobil's argument on this issue fails because the claims Connecticut has chosen to bring in this case

seek redress for deceptive and unfair practices relating to ExxonMobil's interactions with consumers in Connecticut - not for harms that might result from the manufacture or use of fossil fuels[.]"); Minnesota v. Am. Petroleum Inst., No. CV 20-1636 (JRT/HB), 2021 WL 1215656, at *13 (D. Minn. Mar. 31, 2021) ("[T]he State's action here is far more modest than the caricature Defendants present."); Massachusetts v. Exxon Mobil Corp., 462 F. Supp. 3d 31, 44 (D. Mass. 2020) ("Contrary to ExxonMobil's caricature of the complaint, the Commonwealth's allegations do not require any forays into foreign relations or national energy policy. It alleges only corporate fraud.").

The source of Plaintiffs' alleged injury is Defendants' alleged failure to warn and deceptive promotion. See Sunoco LP, 39 F.4th at 1113 ("[t]his case is about whether oil and gas companies misled the public about dangers from fossil fuels."). Even were this court to determine that federal common law retains preemptive effect after displacement, the federal common law cited to by Defendants would not preempt Plaintiffs' claims in this case. The source of Plaintiffs' injury is not pollution, nor emissions. Instead, the source of Plaintiffs' alleged injury is Defendants' alleged failure to warn and deceptive promotion. Therefore, even if federal common law had not been displaced, Plaintiffs' claims would not be preempted by it.

### 4. We decline to expand federal common law, and, in any event, Defendants waived such an argument

In their opening brief, Defendants say they "do not seek to expand federal common law to a new sphere" and instead "rely on extensive Supreme Court precedent establishing that federal law already governs in this area." Defendants have waived any argument to expand federal common law to cover Plaintiffs' claims here. Second, Defendants fail to point to any case recognizing new federal common law decided after AEP and Kivalina II displaced the old federal common law that once governed suits for interstate pollution damages or abatement. We reiterate that the sources of Plaintiffs' alleged injury are Defendants' alleged tortious marketing and failure to warn. Defendants also fail to point to any case recognizing federal common law governing tortious marketing suits.

Even if Defendants had argued federal common law should be expanded to cover tortious marketing, that argument would fail because the "cases in which federal courts may engage in common lawmaking are few and far between." Rodriguez v. FDIC, 140 S. Ct. 713, 716 (2020). We see no "uniquely federal interests" in regulating marketing conduct, an area traditionally governed by state law. See id. at 717.

We also decline to create new federal common law governing suits that "involv[e] . . . interstate air pollution."

(Emphasis in original.)  Congress has enacted a comprehensive legislative scheme to address interstate air pollution, and "once Congress addresses a subject, even a subject previously governed by federal common law, the justification for lawmaking by the federal courts is greatly diminished."  Nw. Airlines, 451 U.S. at 95 n.34 (emphasis added).  "[I]t is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest."  AEP, 564 U.S. at 423-24.  And "[c]ases justifying judicial creation of preemptive federal rules are extremely limited: [w]hether latent federal power should be exercised to displace state law is primarily a decision for Congress, not the federal courts."  In re Nat'l Sec. Agency Telecomms. Recs. Order Litig., 483 F. Supp. 2d 934, 940 (N.D. Cal. 2007) (quoting Atherton, 519 U.S. at 218) (quotation marks omitted).  "Our commitment to the separation of powers is too fundamental to continue to rely on federal common law by judicially decreeing what accords with common sense and the public weal when Congress has addressed the problem."  Milwaukee II, 451 U.S. at 315 (internal quotation marks omitted).

**C.    The CAA Does Not Preempt Plaintiffs' Claims**

Having determined that displaced federal common law plays no part in this court's preemption analysis, we now turn to whether the CAA preempts Plaintiffs' state claims.  See

64

Boulder, 25 F.4th at 1261 ("As instructed in AEP and supported by [Kivalina II], we look to the federal act that displaced the federal common law to determine whether the state claims are preempted."). Defendants say that federal law must govern all suits that "involve[] interstate and international emissions." (Emphasis added). They say that a large damage award in effect could regulate air pollution,[13] and that air pollution is an area governed exclusively by "federal law." But the question before the court is not whether a potential damages award in this case could regulate air pollution. If that were true, then any case with a potentially large damage award must be dismissed because it might regulate a field – the mere possibility of regulation, standing alone, is not enough to dismiss Plaintiffs' claims. A suit does not "regulate" a matter simply because it might have "an impact" on that matter. Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 50 (1987). Rather, the operative question is whether Plaintiffs' state law claims are preempted by federal law. To prevail, Defendants need to show not only that Plaintiffs' claims could lead to a large damages award that effectively acts

---

[13] Defendants cite to Kurns v. R.R. Friction Prod. Corp., 565 U.S. 625, 637 (2012), a products liability cases involving a railroad worker exposed to asbestos, to argue that damages awards can effectively act as regulation. This is accurate, but incomplete. The Court did not ask only whether such a large damages award could operate as a regulation. The Court further engaged in a preemption analysis, and asked whether such an award was preempted by federal law. Id. Based on prior precedent, the Court concluded that Congress had occupied the entire field of locomotive equipment regulation and that the worker's claims were therefore preempted. Id.

as a regulation, but critically, that such a large damages award is preempted by federal law. Defendants do not do so.

The doctrine of preemption is rooted in the federal Constitution's Supremacy Clause, which provides that federal law "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Courts begin with the presumption that state laws and claims are not preempted. Wyeth v. Levine, 555 U.S. 555, 565 (2009). This is because the "historic police powers of the States [are] not to be superseded . . . unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) (citing Napier v. Atlantic Coast Line R. Co., 272 U.S. 605, 611 (1926) and Allen-Bradley Local v. Wisconsin Employment Relations Board, 315 U.S. 740, 749 (1942)).[14] Therefore, when determining whether a statute is preempted through any preemption doctrine, courts primarily evaluate whether Congress intended to preempt state law. Id.

---

[14]    The Supreme Court has applied this presumption against preemption of historic police powers broadly. Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 528-29 (1992) (requiring a showing of congressional intent to supersede state common law duties not to make false statements or conceal facts and holding that Congress expressed no such intent in the Federal Cigarette Labeling and Advertising Act); CTS Corp v. Waldburger, 573 U.S. 1, 19 (2014) (quoting Wos v. E.M.A., 568 U.S. 627, 639-40 (2013)) ("[i]n our federal system, there is no question that States possess the 'traditional authority to provide tort remedies to their citizens' as they see fit").

There are two types of preemption: complete and substantive (or ordinary) preemption. <u>City of Hoboken v. Chevron Corp.</u>, 45 F.4th 699, 707 (3d Cir. 2022). Complete preemption applies only in the context of federal removal jurisdiction, which is not at issue here.[15] <u>Id.</u> Defendants argue that the CAA substantively preempts Plaintiffs' state tort law claims.

In general, there are three types of substantive preemption:

> (1) <u>express preemption</u>, where Congress has expressly preempted local law; (2) <u>field preemption</u>, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) <u>conflict preemption</u>, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

<u>New York SMSA Ltd. P'ship v. Town of Clarkstown</u>, 612 F.3d 97, 104 (2d Cir. 2010) (emphases added) (citing <u>English v. General Elec. Co.</u>, 496 U.S. 72, 78-79 (1990)).

Defendants do not specify which substantive preemption theory they rely on. We address each preemption theory in turn.

First, <u>express preemption</u> does not apply. Federal law expressly preempts state law where the federal statute contains an express preemption clause barring state law claims in

---

[15] The Supreme Court has only recognized three federal statutes that completely preempt state laws: "ERISA, the National Bank Act, and the Labor-Management Relations Act." <u>City of Hoboken</u>, 45 F.4th at 707 (citing <u>Beneficial Nat'l Bank v. Anderson</u>, 539 U.S. 1, 6-8, 10-11 (2003)).

67

enumerated areas.  Oneok, Inc. v. Learjet, Inc., 575 U.S. 373, 376 (2015) (holding that Congress may "pre-empt . . . a state law through . . . express language in a statute").  Simply put, the CAA contains no "express language" preempting state common law tort claims.  See id.  Rather, the CAA explicitly preserves "any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief[.]"  42 U.S.C. § 7604(e) (2018).

Second, field preemption does not apply because the CAA does not completely occupy the field of emissions.  Field preemption applies where (1) the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement" the regulation, or (2) the "federal interest is so dominant" in a field "that the federal system will be assumed to preclude enforcement of state laws on the same subject."  Rice, 331 U.S. at 230.  Field preemption "reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards," so "even complementary state regulation is impermissible" when Congress has occupied an entire field.  Arizona v. United States, 567 U.S. 387, 401 (2012).

The CAA simply does not occupy the entire field of emissions regulation, as noted above. Merrick, 805 F.3d at 694 (holding that CAA does not bar state common law claims against in-state emitters because "environmental regulation is a field that the states have traditionally occupied"). "There is no evidence that Congress intended that all emissions regulation occur through the [CAA's] framework, such that any state law approach to emissions regulation would stand as an obstacle to Congress's objectives." Id. at 695. Indeed, under the CAA, each state retains regulatory power through their State Implementation Plan (SIP), which provides for state-level implementation, maintenance, and enforcement of CAA emissions standards with federal oversight. 42 U.S.C. § 7410(a)(1) (2018). While the federal government has primary authority over emissions legislation, states are responsible for implementation through their SIP. See id. And the CAA's "Retention of State authority" section expressly protects a state's right to adopt or enforce any standard or limitation respecting emissions unless the state policy in question would be less stringent than the CAA. 42 U.S.C. § 7416 (2018).[16] Congress encouraged states

---

[16] 42 U.S.C. § 7416 (2018) provides:

Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) nothing in this chapter

to participate through SIPs and provided for state regulation of any emissions standard or limitation as stringent as or more stringent than the CAA.  See 42 U.S.C. § 7410(a)(1) (2018).

Accordingly, the CAA does not occupy the field of emissions regulation such that state law is preempted – it does not "reflect[] a congressional decision to foreclose any state regulation in the area."  Arizona, 567 U.S. at 401.  And, even if it did, the City's claims do not seek to regulate emissions, and so a claim of field preemption in the field of emissions regulation is inapposite.

Third, conflict preemption does not apply.  Conflict preemption takes two forms.  The first form is obstacle preemption, where state law claims "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Arizona, 567 U.S. at 399 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  The second form is impossibility preemption, which is a "demanding defense", Wyeth, 555 U.S. at 573, that succeeds where state law claims are shown

---

shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

to directly conflict with federal law or penalize behavior that federal law requires. AT&T Co. v. Cent. Off. Tel., Inc., 524 U.S. 214, 227 (1998) (holding that federal statute preempts state law when state law claims directly conflict with federal law); Geier v. Am. Honda Motor Co., 529 U.S. 864, 873 (2000) (holding that federal statute preempts state law where state law penalizes what federal law requires). Neither obstacle preemption nor impossibility preemption applies here.

### 1. Obstacle preemption does not apply

The CAA does not preempt Plaintiffs' claims through obstacle preemption because their claims arise from Defendants' alleged failure to warn and deceptive marketing conduct, not emissions-producing activities regulated by the CAA. Obstacle preemption applies only where there is an "actual conflict" between state law and a statute's overriding federal purpose and objective. Mary Jo C. v. N.Y. State & Loc. Ret. Sys., 707 F.3d 144, 162 (2d Cir. 2013). "[T]he conflict between state law and federal policy must be a sharp one." Marsh v. Rosenbloom, 499 F.3d 165, 178 (2d Cir. 2006) (quotation marks omitted). The operative federal purpose or policy is defined by "examining the federal statute as a whole and identifying its purpose and intended effects," and "[w]hat is a sufficient obstacle is a matter of judgment." Arizona, 567 U.S. at 400 (quoting Crosby, 530 U.S. at 363).

71

The U.S. Supreme Court has applied this standard sparingly, finding obstacle preemption in only two scenarios: (1) where a federal legislation involved a uniquely federal area of regulation and state law directly conflicted with the federal program's operation, and (2) where Congress has clearly chosen to preclude state regulation because the federal legislation struck a delicate balance of interests at risk of disturbance by state regulation.[17] In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 959 F.3d 1201, 1212 (9th Cir. 2020). But this is a "high threshold." Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 607 (2011).

Here, the CAA's identified purposes are to protect the country's air resources, public health, and welfare; prevent and control air pollution; and support state, local, and regional air pollution prevention and control efforts. See 42 U.S.C. § 7401(b) (2018); Bunker Hill Co. Lead & Zinc Smelter v. EPA, 658 F.2d 1280, 1284 (9th Cir. 1981) ("[The CAA] was intended

---

[17] The first category historically includes areas such as foreign affairs powers and regulating maritime vessels. Crosby, 530 U.S. at 373-74 (holding that the federal foreign affairs power is a uniquely federal area of regulation); United States v. Locke, 529 U.S. 89, 97 (2000) (holding that maritime vessel regulation is a uniquely federal area). The second category historically includes criminal immigration penalties, vehicle safety device implementation, and interstate pollution under the Clean Water Act. Arizona, 567 U.S. at 405 (holding that the federal government struck a balance in immigration penalties that would be disturbed by an additional state law criminal penalty); Geier, 529 U.S. at 879-81 (holding that the federal government struck a balance in gradual airbag phase-in that would be undermined by a state law immediate implementation requirement); Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494, 497 (1987) (holding that affected-state claims against out-of-state polluters stand as an obstacle to the balance struck by the Clean Water Act).

comprehensively to regulate, through guidelines and controls, the complexities of restraining and curtailing modern day air pollution."). The CAA achieves these purposes primarily by "regulat[ing] pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircraft." Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 308 (2014).

Plaintiffs' state tort law claims do not seek to regulate emissions, and there is thus no "actual conflict" between Hawai'i tort law and the CAA. See Mary Jo, 707 F.3d at 162. These claims potentially regulate marketing conduct while the CAA regulates pollution. We agree with Plaintiffs that the "CAA does not concern itself in any way with the acts that trigger liability under Plaintiffs' Complaint, namely: the use of deception to promote the consumption of fossil fuel products." The CAA expresses no policy preference and does not even mention marketing regulations.

Defendants argue that the CAA preempts Plaintiffs' claims because Congress preempted affected-state common law claims regarding emissions through the CAA, and Plaintiffs' claims seek to regulate out-of-state emissions. Affected-state claims are state law actions where the injury occurred in a different state from the state where the emission was released; courts have held that the CAA preempts these claims. See Int'l

Paper Co. v. Ouellette, 479 U.S. 481, 500 (1987).  Source-state claims are state law actions where the injury was suffered in the same state as the emitting conduct; courts have held that the CAA does not preempt these claims.  See id.

Relying on Ouellette, Defendants say "[e]very federal court of appeals to consider this issue has recognized that the CAA does not permit States to use their state tort law to address harms caused by emissions occurring in other States." Defendants are correct, but their analysis is incomplete.  In Ouellette, the Supreme Court examined whether the Clean Water Act (CWA) preempted "a common-law nuisance suit filed in a Vermont court under Vermont law, when the source of the alleged injury [was] located in New York."  Id. at 483.  The Supreme Court held that affected-state common law claims arising from polluting activity located outside the affected-state are preempted by the CWA because "[t]he application of affected-state laws would be incompatible with the [CWA's] delegation of authority and its comprehensive regulation of water pollution." Id. at 500.  Applying affected-state common law could potentially subject a defendant-polluter to "an indeterminate number of potential regulations" depending on how far the emission traveled.[18]  Id. at 499; see also Merrick, 805 F.3d at

---

[18]    Defendants also cite to N. Carolina, ex rel. Cooper v. Tennessee Valley Auth., 615 F.3d 291, 297 (4th Cir. 2010), arguing that Ouellette's

74

693 (explaining that "claims based on the common law of the source state . . . are not preempted by the [CAA,]" but "claims based on the common law of a non-source state . . . are preempted by the [CAA]").

But the rationale motivating the Ouellette court in preempting affected-state common law claims does not apply to Plaintiffs' state tort claims. This is because Plaintiffs' claims require "additional tortious conduct" to succeed. MTBE, 725 F.3d at 104. Here, that additional tortious conduct is Defendants' alleged deceptive marketing and failure to warn about the dangers of using their products – the source of Plaintiffs' alleged injury is not emissions but the additional alleged torts.

In this case, as in MTBE, Defendants' alleged tortious conduct is not production of emissions and therefore, obstacle preemption does not apply. In MTBE, the defendant gasoline producer used MTBE, a fuel additive that reduced emissions, to

_____

rationale in determining the CWA preempted affected-state common law claims should be applied to the CAA. In Cooper, the Fourth Circuit determined that North Carolina's nuisance action seeking an injunction against fixed powerplants from emitting sulfur dioxides and nitrous oxides was preempted by the CAA because the "EPA has promulgated [National Ambient Air Quality Standards] for a number of emissions, including standards for all the emissions involved in this case." Id. at 299. Critically, the CAA, and the agency it empowers (the EPA), had already expressly regulated the very emissions (sulfur dioxides and nitrous oxides) alleged to have caused the nuisance. Id. at 299-303. But the Cooper court refused to "hold flatly that Congress has entirely preempted the field of emissions regulation." Id. at 302. And it acknowledged that the "Ouellette Court itself explicitly refrained from categorically preempting every nuisance action brought under source state law." Id. at 303.

bring its gasoline into compliance with the CAA's minimum oxygen content requirement. Id. at 129. The CAA identified a number of substances, including MTBE, that could have been added to gasoline to help bring it into compliance with the oxygen content requirement. Id. at 81. New York City and its agencies brought ten causes of action, including strict liability failure to warn, negligence, public nuisance, private nuisance, and trespass, arguing that the defendant oil producer's use of MTBE caused detrimental contamination of groundwater. Id. at 80-83. The defendant argued that the plaintiff's tort claims "conflict[ed] with and are therefore preempted by . . . the [CAA] Amendments of 1990[.]" Id. at 95.

The Second Circuit held that New York City's claims were not preempted under either obstacle or impossibility preemption. Id. at 97-103. The court held that where a party participates in a non-polluting emissions-related activity (i.e., choosing gasoline additives), the fact that it complied with relevant CAA provisions did not absolve the party of any state common law or statutory duties to warn of public hazards or comply with an additional standard of care. Id. at 65. In short, the Second Circuit determined that state tort law claims are not preempted by the CAA where the alleged tortious behavior does not produce emissions. Id. at 104-05.

76

Plaintiffs' claims simply do not risk subjecting Defendants to "an indeterminate number of potential regulations" because the claims do not subject Defendants to any additional emissions regulation at all.  See Ouellette, 479 U.S. at 499. Plaintiffs are correct that where the emissions originate is irrelevant because emissions are at most a link in the causal chain connecting Plaintiffs' alleged injuries and Defendants' unrelated liability-incurring behavior.  **[AB at 33, ICA Dkt. 65:43]**  Simply put, this means obstacle preemption does not apply.

## 2. Impossibility preemption does not apply

At its most demanding, the impossibility doctrine historically required it to be a "physical impossibility" to comply with both state and federal requirements for federal law to preempt state law.  Florida Lime & Avocado Growers v. Paul, 373 U.S. 132, 143 (1963).[19]  The modern impossibility doctrine is broader and now includes instances where state law penalizes what federal law requires, Geier, 529 U.S. at 873, or where state law claims directly conflict with federal law, AT&T Co.,

---

[19]    Under the Florida Lime & Avocado Growers standard, some scenarios would yield different results than preemption doctrine's intended effect: "[f]or example, if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." Wyeth, 555 U.S. at 590 (2009) (Thomas, J., concurring).  In that scenario, it is not a physical impossibility to comply with both requirements, but modern doctrine would find a sufficient conflict between federal and state law to preempt state law through impossibility preemption.

524 U.S. at 227. But impossibility preemption is still a "demanding defense." Wyeth, 555 U.S. at 573. Defendants do not raise impossibility preemption, and it does not apply regardless.

MTBE is instructive again. There, the Second Circuit declined to preempt state tort claims through impossibility preemption where: (1) it was possible to comply with the CAA and avoid tort liability; (2) state and federal law did not directly conflict; and (3) the CAA did not require the alleged conduct. MBTE, 725 F.3d at 97. The oil producer defendant could have complied with both state and federal law if it had used other additives (like ethanol) that did not pose the same health risk as MTBE but would bring the fuel into CAA oxygen content compliance without incurring prohibitively high costs. Id. at 99-101. Though the CAA identified MTBE as one additive that would sufficiently boost oxygen content, at no point did it require the specific use of MTBE in gasoline – it was one of many options. Id. at 98.

The same is true here. The CAA does not bar Defendants from warning consumers about the dangers of using their fossil fuel products. See id. Defendants could simply avoid federal and state liability by adhering to the CAA and separately issuing warnings and refraining from deceptive conduct as required by Hawaiʻi law; it is not a "physical

78

impossibility" to do both concurrently. See Florida Lime & Avocado Growers, 373 U.S. at 143; State ex rel. Shikada v. Bristol-Myers Squibb Co., 152 Hawai'i 418, 438, 526 P.3d 395, 415 (2023) (rejecting a pharmaceutical company's argument that "there was no way [it] could have updated [a drug's] label to provide the warning that [state law] require[d] and at the same time comply with federal law" regarding drug labeling).

## V.    CONCLUSION

For the foregoing reasons, we hold that Defendants are subject to specific jurisdiction in Hawai'i and that neither federal common law nor the Clean Air Act preempt Plaintiffs' claims. We reiterate that federal common law retains no preemptive effect after it is displaced. Were we to adopt Defendants' argument that displaced federal common law preempts Plaintiffs' state law claims, Plaintiffs could not recover under Hawai'i tort law, even where the state specifically permits lawsuits to hold companies responsible for allegedly deceptive marketing claims about any product, including oil and gas products. We decline to unduly limit Hawai'i's ability to use its police powers to protect its citizens from alleged deceptive marketing.

Accordingly, the circuit court's Order Denying Defendants' Motion to Dismiss for Failure to State a Claim, filed March 29, 2022, and Order Denying Defendants' Joint Motion

to Dismiss for Lack of Personal Jurisdiction, filed March 31, 2022, are affirmed.

Theodore J. Boutrous, Jr.,*
Joshua D. Dick,*
Melvyn M. Miyagi,
Ross T. Shinyama,
Summer H. Kaiawe,
Andrea E. Neuman,* and
Erica W. Harris,*
for appellants Chevron
Corporation and Chevron
U.S.A., Inc.

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Ronald G. Johnson

/s/ John M. Tonaki



C. Michael Heihre,
Michi Momose,
J. Scott Janoe,*
Megan Berge,* and
Sterling Marchand,*
for appellants Sunoco LP, Aloha
Petroleum, Ltd., and Aloha
Petroleum LLC

Paul Alston,
John-Anderson L. Meyer,
Claire Wong Black,
Glenn T. Melchinger,
Theodore V. Wells, Jr.,*
Daniel J. Toal,* and
Yahonnes Cleary,*
for appellants Exxon Mobil
Corporation and ExxonMobil Oil
Corporation

Joachim P. Cox,
Randall C. Whattoff,
David C. Frederick,*
James M. Webster III,* and
Daniel S. Severson,*
for appellants Shell plc (f/k/a
Royal Dutch Shell plc), Shell
U.S.A. Inc. (f/k/a Shell Oil
Company), and Shell Oil
Products Company LLC

Margery S. Bronster,
Lanson K. Kupau,
Kelly A. Higa Brown,
Victor L. Hou,* and
Boaz S. Morag,*
for appellants Woodside
Energy Hawaii Inc. (f/k/a
BHP Hawaii Inc.) and
appellee BHP Group Limited

Lisa A. Bail,
David J. Hoftiezer,
Jonathan W. Hughes,*
Matthew T. Heartney,* and
John D. Lombardo,*
for appellants BP plc and
BP America Inc.

Ted N. Pettit,
Shannon S. Broome,*
Shawn Patrick Regan,* and
Anne Marie Mortimer,*
For appellants Marathon
Petroleum Corporation

Crystal K. Rose,
Adrian L. Lavarias,
Sharon Paris,
Jameson R. Jones,*
Daniel R. Brody,*
Steven M. Bauer,*
Margaret A. Tough,* and
Katherine A. Rouse,*
for appellants ConocoPhillips,
ConocoPhillips Company

Crystal K. Rose,
Adrian L. Lavarias,
Sharon Paris,
Steven M. Bauer,*
Margaret A. Tough,* and
Katherine A. Rouse,*
for appellants Phillips 66 and
Phillips 66 Company

Victor M. Sher,\*
Dana M.O. Viola,
Robert M. Kohn,
Nicolette Winter,
Jeff A. Lau,
Matthew K. Edling,\*
Corrie J. Yackulic,\* and
Stephanie D. Biehl,\*
for appellees City and County
of Honolulu and Honolulu Board
of Water Supply

*\*pro hac vice*

Anne E. Lopez
Ewan C. Rayner
for amicus curiae
Department of Attorney General

Tara A. Buckley
for amicus curiae
Hawaiʻi State Association of
Counties

Chase H. Livingston
for amicus curiae
Legal Scholars

Mark M. Murakami
for amicus curiae
Chamber of Commerce of the
United States of America